**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ED BROWN, as parent and next
friend of Vanessa Brown;
ROSALYNNE BROWN, as parent and
next friend of Vanessa Brown;
VANESSA BROWN, a minor child
attending Thomas Jefferson High
School for Science and Technology
in Fairfax, Virginia; MARC J.
COHEN, as parent and next friend of
Amy and Michael Cohen; MICHAEL
COHEN, a minor child attending
Spring Hill School in Fairfax,
Virginia; AMY COHEN, a minor child
attending Spring Hill School in
Fairfax, Virginia; FRANK M.
FEIBELMAN, as parent and next friend          No. 00-2132
of Seth Feibelman; SETH FEIBELMAN,
a minor child attending Henrico
County Middle School in Henrico
County, Virginia; GREGORY
KRUGLAK, as parent and next friend
of Kathryn Anya Kruglak; PATRICIA
KRUGLAK, as parent and next friend
of Kathryn Anya Kruglak; KATHRYN
ANYA KRUGLAK, a minor child
attending Thomas Jefferson High
School for Science and Technology
in Fairfax, Virginia; JEFFREY M.
LEPON, as parent and next friend of
Jana Lepon and Ariel Lepon; CORA
YAMAMOTO, as parent and next
friend of Jana Lepon and Ariel

Lepon; Jana Lepon, a minor child attending Longfellow Middle School in Fairfax County, Virginia; Ariel Lepon, a minor child attending Haycock Elementary School in Fairfax County, Virginia; Wayne Gray, as parent and next friend of Robyn Gray; Deborah Gray, as parent and next friend of Robyn Gray; Robyn Gray, a minor child attending White Oak Elementary School in Fairfax County, Virginia; Mark MaGruder, as parent and next friend of Mia MaGruder; Ella MaGruder, as parent and next friend of Mia MaGruder; Mia MaGruder, a minor child attending Amherst Middle School in Amherst County, Virginia; Roy Kupersmith, as parent and next friend of Jordan Kupersmith; Adriana Kupersmith, as parent and next friend of Jordan Kupersmith; Jordan Kupersmith, a minor child attending Potomac Falls High School in Loudoun County, Virginia,

*Plaintiffs-Appellants,*

v.

James Gilmore, The Honorable James Gilmore in his official capacity as Governor of the Commonwealth of Virginia; Wilbert Bryant, The Honorable Wilbert Bryant in his official

capacity as Virginia Secretary of
Education; JO LYNNE DEMARY, in
her official capacity as Virginia
Superintendent of Public Instruction;
VIRGINIA BOARD OF EDUCATION;
VIRGINIA DEPARTMENT OF EDUCATION;
DANIEL DOMENECH, in his official
capacity as Division Superintendent
Fairfax County Public Schools;
MARK A. EDWARDS, in his official
capacity as Division Superintendent
Henrico County Public Schools;
JOHN J. DANIELS, in his official
capacity as Division Superintendent
Amherst County Public Schools;
THE FAIRFAX COUNTY SCHOOL
BOARD; HENRICO COUNTY SCHOOL
BOARD; AMHERST COUNTY SCHOOL
BOARD; EDGAR B. HATRICK, in his
official capacity as Division
Superintendent Loudoun County
Public Schools; LOUDOUN COUNTY
SCHOOL BOARD,
              *Defendants-Appellees.*

ED BROWN, as parent and next
friend of Vanessa Brown;
ROSALYNNE BROWN, as parent and
next friend of Vanessa Brown;
VANESSA BROWN, a minor child
attending Thomas Jefferson High
School for Science and Technology
in Fairfax, Virginia; MARC J.
COHEN, as parent and next friend of

No. 00-2400

Amy and Michael Cohen; MICHAEL COHEN, a minor child attending Spring Hill School in Fairfax, Virginia; AMY COHEN, a minor child attending Spring Hill School in Fairfax, Virginia; FRANK M. FEIBELMAN, as parent and next friend of Seth Feibelman; SETH FEIBELMAN, a minor child attending Henrico County Middle School in Henrico County, Virginia; GREGORY KRUGLAK, as parent and next friend of Kathryn Anya Kruglak; PATRICIA KRUGLAK, as parent and next friend of Kathryn Anya Kruglak; KATHRYN ANYA KRUGLAK, a minor child attending Thomas Jefferson High School for Science and Technology in Fairfax, Virginia; JEFFREY M. LEPON, as parent and next friend of Jana Lepon and Ariel Lepon; CORA YAMAMOTO, as parent and next friend of Jana Lepon and Ariel Lepon; JANA LEPON, a minor child attending Longfellow Middle School in Fairfax County, Virginia; ARIEL LEPON, a minor child attending Haycock Elementary School in Fairfax County, Virginia; WAYNE GRAY, as parent and next friend of Robyn Gray; DEBORAH GRAY, as parent and next friend of Robyn Gray; ROBYN GRAY, a minor child attending White Oak Elementary School in Fairfax County, Virginia;

MARK MAGRUDER, as parent and
next friend of Mia MaGruder; ELLA
MAGRUDER, as parent and next
friend of Mia MaGruder; MIA
MAGRUDER, a minor child attending
Amherst Middle School in Amherst
County, Virginia; ROY KUPERSMITH,
as parent and next friend of Jordan
Kupersmith; ADRIANA KUPERSMITH,
as parent and next friend of Jordan
Kupersmith; JORDAN KUPERSMITH, a
minor child attending Potomac Falls
High School in Loudoun County,
Virginia,

*Plaintiffs-Appellants,*

v.

JAMES GILMORE, The Honorable
James Gilmore in his official
capacity as Governor of the
Commonwealth of Virginia;
WILBERT BRYANT, The Honorable
Wilbert Bryant in his official
capacity as Virginia Secretary of
Education; JO LYNNE DEMARY, in
her official capacity as Virginia
Superintendent of Public Instruction;
VIRGINIA BOARD OF EDUCATION;
VIRGINIA DEPARTMENT OF EDUCATION;
DANIEL DOMENECH, in his official
capacity as Division Superintendent
Fairfax County Public Schools;
MARK A. EDWARDS, in his official
capacity as Division Superintendent
Henrico County Public Schools;

JOHN J. DANIELS, in his official
capacity as Division Superintendent
Amherst County Public Schools;
THE FAIRFAX COUNTY SCHOOL
BOARD; HENRICO COUNTY SCHOOL
BOARD; AMHERST COUNTY SCHOOL
BOARD; EDGAR B. HATRICK, in his
official capacity as Division
Superintendent Loudoun County
Public Schools; LOUDOUN COUNTY
SCHOOL BOARD,
                    *Defendants-Appellees.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-00-1044-A)

Argued: May 8, 2001

Decided: July 24, 2001

Before NIEMEYER, WILLIAMS, and KING, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Williams joined. Judge King wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Stuart Henry Newberger, CROWELL & MORING, L.L.P., Washington, D.C., for Appellants. William Henry Hurd, Solicitor General, OFFICE OF THE ATTORNEY GENERAL, Rich-

mond, Virginia, for Appellees. **ON BRIEF:** Daniel A. Sasse, David L. Haga, Christina M. Mireles, CROWELL & MORING, L.L.P., Washington, D.C.; Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, Richmond, Virginia, for Appellants. Mark L. Earley, Attorney General, Ashley L. Taylor, Jr., Deputy Attorney General, Alison P. Landry, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

In 2000, the Commonwealth of Virginia amended a 1976 statute to mandate that each school division in the state establish in its classrooms a "minute of silence" so that "each pupil may, in the exercise of his or her individual choice, *meditate, pray, or engage in any other silent activity* which does not interfere with, distract, or impede other pupils in the like exercise of individual choice." Va. Code Ann. § 22.1-203 (Michie 2000) (emphasis added). Several Virginia students and their parents commenced this action to challenge this statute on its face, contending that it establishes religion in violation of the First Amendment. The district court rejected the challenge, and we affirm.

I

In 1976, Virginia enacted into law § 22.1-203. This provision *authorized*, but did not require, local school boards to establish a minute of silence in their classrooms for the expressly stated purpose of allowing students to meditate, pray, or engage in any other silent activity. In 1994, the Virginia General Assembly required the Virginia Board of Education to adopt guidelines on religious activities in the schools. *See* Va. Code Ann. § 22.1-280.3. As directed, the Board of Education adopted "Guidelines Concerning Religious Activities in the Public Schools," in which it provided:

> Public schools may provide students . . . with a minute of
> silence to collect themselves and put their upcoming tasks

> in meaningful perspective for the individual student. A brief minute of silence may also fulfill other secular objectives, including maintenance of discipline.

> \*      \*      \*

> The teacher may not indicate his or her views on whether students should use the time to pray or not to pray. The teacher should also not use the time to pray aloud in front of other students, nor permit any other student, or groups of students, to pray aloud.

Acting under the authority of the 1976 law, at least 14, and perhaps 20 school divisions in Virginia chose to establish a minute of silence in their classrooms, and a survey conducted by the Virginia Superintendent of Schools revealed that this minute of silence has not led to any peer-on-peer religious harassment.

In 2000, the Virginia legislature amended § 22.1-203 to *require* that every school division provide a minute of silence in the State's public school classrooms and to direct the Attorney General to defend the statute when it is challenged in court. The amended law became effective July 1, 2000.[1]

---

[1]The following shows how Va. Code Ann. § 22.1-203 was amended in 2000:

> In order that the right of every pupil to the free exercise of religion be guaranteed within the schools and that the freedom of each individual pupil be subject to the least possible pressure from the Commonwealth either to engage in, or to refrain from, religious observation on school grounds, the school board of each school division is authorized to *shall* establish the daily observance of one minute of silence in each classroom of the division.

> Where *During* such one-minute period of silence is instituted, the teacher responsible for each classroom shall take care that all pupils remain seated and silent and make no distracting display to the end that each pupil may, in the exercise of his or her individual choice, meditate, pray, or engage in any other silent activ-

Senator Warren Barry, who sponsored Senate Bill 209 ("SB 209") containing the 2000 amendments to Virginia Code § 22.1-203, explained to the press that he introduced the bill in response to some recent highly publicized incidents of school violence with the hope that encouraging regular introspection by students would somehow lessen the urges of students to resort to violence. When asked by a newspaper reporter about his intent in sponsoring the bill, Senator Barry responded that his intent was not to force prayer in schools, but he added, "This country was based on belief in God, and maybe we need to look at that again."[2]

During debate of SB 209, some of the senators manifested their concern about the constitutionality of the bill. Senator Edward Houck of Spotsylvania stated that, given the religious diversity of his constituents — "Christians and Muslims and Hindus and atheists" — the proposed amendments, despite the fact that they were "pure in terms of [their] intent," would amount to "crossing the line." Accordingly, he urged his colleagues to "insulate . . . all of our teachers and our school divisions from that tricky wicket of what is religious freedom and what is not" by striking the meditation and prayer language from the bill. Senator Stephen Newman of Lynchburg criticized this position because such an altered bill would lack any "indication . . . [of] what those students are [going to] be doing at all [during the minute of silence]. They, simply will be quiet with no purpose." Senator Newman explained further that the use of the terms "meditation, prayer and reflection" gives direction to what may be done during the minute of silence, but in no way could be viewed as sectarian. Simi-

---

ity which does not interfere with, distract, or impede other pupils in the like exercise of individual choice.

*The Office of the Attorney General shall intervene and shall provide legal defense of this law.*

(Italics show additions and strike-throughs show deletions).

[2]The parties disagree whether statements to the press are admissible as exceptions to the hearsay rule. We do not decide this question but include this statement only for the sake of completeness. We do not, however, believe that its inclusion materially adds or detracts from the views of legislators contained in the legislative record.

larly, Senator Barry, the bill's sponsor, rejected any interpretation that associated the bill with school prayer. He stated:

> [T]he purpose of the Bill has been stated and restated is not a religious crusade. It's not to try and re-inject prayer into the public school system. The primary thing was out of the frustrations that many of us have felt based on the violence in some of our schools, such as Columbine and the Kinkley (ph.) situation in Oregon. This was simply an opportunity, hopefully, that kids in school would reflect if more than anything else. I'm saying, we're not putting prayer on a higher pedestal or a lower pedestal than meditate and reflect. But if students would just spend one minute to reflect on who they are, what they're doing and where they're going. The word prayer in there was put in there so prayer would not be discriminated against.

SB 209 passed the Virginia Senate in the form introduced.

In the House of Delegates, Delegate Robert McDonnell, the House floor manager of the bill, explained that the bill was grounded in both "sound public policy" and the secular purposes "of maintaining good order and discipline, creating student focus on the activities at hand and assisting the teachers in beginning the day with a period of calm which would lead to better discipline in the classroom." He added:

> [Our students] are involved in so many activities, we expect the best out of our students. So, many of the experts certainly would agree and I think it has born[e] out in the localities that have implemented [the 1976 statute], that this certainly also helps not only with the focus but also perhaps with stress reduction in having a period of concentrated silence as they begin the school day.

The House, too, passed SB 209, and Governor James Gilmore signed it into law on April 19, 2000.[3]

---

[3]The same General Assembly that enacted SB 209 also enacted House Joint Resolution 71, which consisted of a request to Congress that it take steps to amend the federal Constitution so as to permit voluntary school prayer of the type that had been found unconstitutional by the Supreme Court in its landmark decision of *Engel v. Vitale*, 370 U.S. 421 (1962).

In his "*Sine Die*" statement to the General Assembly at the conclusion of its 2000 term, Governor Gilmore praised the passage of SB 209, stating that it would "restore a sense of calm and civility in public schools by offering students a peaceful minute each day to reflect upon their studies, to collect their thoughts, or, if they so choose, to bow their heads and pray."

On June 13, 2000, the Virginia Department of Education directed a memorandum to school division superintendents and public school principals in Virginia informing them of the changes to Virginia Code § 22.1-203 that were made through SB 209. The memorandum stated that the "legislation reflects the view that [Virginia's] young, and society as a whole, would be well served if students were afforded a moment of quiet reflection at the beginning of each day." The memorandum suggested, as an appropriate format for conducting a minute of silence, that the teacher say, "As we begin another day, let us pause for a moment of silence." The same memorandum warned against permitting or tolerating "any coercion or overbearing by some students to force others to engage in or refrain from prayer or any other permitted activity. This time is not intended to be and shall not be conducted as a religious service or exercise."

A little more than a week later, but before the statute's effective date on July 1, the plaintiffs commenced this action facially challenging § 22.1-203 under the First and Fourteenth Amendments of the U.S. Constitution. They alleged in their complaint that the minute of silence statute violates the Establishment Clause because its purpose was to advance prayer in public schools. The plaintiffs sought a declaratory judgment that the statute was unconstitutional and an injunction prohibiting its enforcement.

Applying the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the district court concluded, by order dated October 26, 2000, that the minute of silence statute "was enacted for a secular purpose, does not advance or inhibit religion, nor is there excessive entanglement with religion." It found, accordingly, that the statute was not unconstitutional and granted summary judgment in favor of the defendants. This appeal followed.[4]

---

[4]On August 31, 2000, the district court denied the plaintiffs' motion for a preliminary injunction to prohibit enforcement of the statute. By

Summarizing on appeal their contention that Virginia's minute of silence statute violates the First Amendment, the plaintiffs state:

> The statute's plain language, coupled with the contemporaneous statements, understandings and actions of the legislators who passed it and the Governor who signed it, all unambiguously indicate that the new Minute of Silence Law was intended to return voluntary prayer to the public school classroom. The bill's sponsor publicly stated the religious motives underlying the statute. Members of both the Senate and House of Delegates expressed their understanding and desire that the Minute of Silence is about prayer. The Virginia legislature purposely rejected proposed amendments to the Minute of Silence bill that would have removed the word "pray" from the statute.

They also argue that the statute is "in all relevant respects" analogous to the moment of silence statute that was held unconstitutional in *Wallace v. Jaffree*, 472 U.S. 38 (1985) (applying the test announced in *Lemon*).

II

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. These Religion Clauses are made applicable to the states through the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947) (applying the Establishment Clause to the states); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (applying the Free Exercise Clause to the states).

Both clauses are designed to protect religious liberty. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313 (2000) (noting that "the

---

order dated September 5, 2000, we denied the plaintiffs' emergency motion for injunction pending appeal. While the appeal from the denial of plaintiffs' motion for a preliminary injunction is also before us, that appeal is resolved by our decision in the appeal on the merits, taken from the summary judgment entered in favor of the defendants on October 26, 2000.

common purpose of the Religion Clauses 'is to secure religious liberty'" (quoting *Engel v. Vitale*, 370 U.S. 421, 430 (1962)); Michael W. McConnell, *Accommodation of Religion*, 1985 Sup. Ct. Rev. 1, 1 ("[R]eligious liberty is the central value and animating purpose of the Religion Clauses"). The Establishment Clause limits any governmental effort to promote particular religious views to the detriment of those who hold other religious beliefs or no religious beliefs, while the Free Exercise Clause affirmatively requires the government not to interfere with the religious practices of its citizens. Religion, accordingly, as distinct from other moral or philosophical systems, is singled out in the Constitution for the special protections contained in the Religion Clauses. *Cf. Gillette v. United States*, 401 U.S. 437, 454 (1971) (upholding against an Establishment-Clause challenge an exemption from an otherwise generally applicable draft law that permitted exemption for those with religious, rather than moral, objection to war). Thus, the Religion Clauses must not be interpreted with a view that religion be suppressed in the public arenas in favor of secularism. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 313 (noting that "[b]y no means do these commands [of the Religion Clauses] impose a prohibition on all religious activity in our public schools"); *Lynch v. Donnelly*, 465 U.S. at 668, 673 (1984) (stating that religion must be accommodated and that "[a]nything less would require the 'callous indifference' we have said was never intended by the Establishment Clause"); *Sch. Dist. of Abingdon Township v. Schempp*, 374 U.S. 203, 225 (1963) ("[T]he State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion" (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)); *Zorach*, 343 U.S. at 314 (noting that if the government could not "respect[ ] the religious nature of our people and accommodate[ ] the public service to their spiritual needs," that would be to "prefer[ ] those who believe in no religion over those who do believe").

The Establishment Clause, on which the plaintiffs rely in this case, prohibits governmental establishment of a religion in the sense of "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970). But this clause does not require total separation of Church and State. "[T]his Nation's history has not been one of entirely sanitized separation between Church and State," and it "has never been thought either possible or desirable to enforce a regime of total separation."

*Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 760 (1973); *accord Lynch*, 465 U.S. at 673. Thus, just as the Free Exercise Clause does not give the citizen having religious scruples an absolute right to escape the burdens of otherwise valid, neutral laws of general applicability, *see Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 881-82 (1990), neither does the Establishment Clause preclude a government from "accommodating" religious scruple by, for example, voluntarily exempting those with the particular religious scruple from the burden imposed by the legislation, even though the Constitution would not, in that circumstance, oblige an accommodation, *see id.* at 890. Not only is the government permitted to accommodate religion without violating the Establishment Clause, at times it is *required* to do so. *See Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 (1987) ("[T]he government may (and sometimes must) accommodate religious practices"); *Lynch*, 465 U.S. at 673 (stating that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions"). And the limits of permissible accommodation are not "coextensive with the non-interference mandated by the Free Exercise Clause." *Walz*, 397 U.S. at 673; *accord Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987). "This authorized, and sometimes mandatory, accommodation of religion is a necessary aspect of the Establishment Clause jurisprudence because, without it, government would find itself effectively and unconstitutionally promoting the absence of religion over its practice." *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 287 (4th Cir. 2000). It is true, however, that "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Amos*, 483 U.S. at 334-35 (quoting *Hobbie*, 480 U.S. at 145).

The line between improper establishment and accommodation "must be delicately drawn both to protect the free exercise of religion and to prohibit its establishment." *Ehlers-Renzi*, 224 F.3d at 288. But the Supreme Court has repeatedly drawn that line in a manner that has upheld a broad range of statutory accommodations against Establishment Clause challenges. *See*, *e.g.*, *Amos*, 483 U.S. at 327, 330 (upholding Title VII's exemption of religious employers even in the context of their non-religious activities); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) (applying Title VII's requirement that employers reasonably accommodate their employees' religious

requirements); *Gillette v. United States*, 401 U.S. 437, 454 (1971) (upholding against an Establishment Clause challenge a statutory exemption from the draft limited to individuals whose religious beliefs cause them to oppose war in any form); *Zorach v. Clauson*, 343 U.S. at 315 (upholding "released time" program for religious instruction of public school children). And in *Lemon*, the Supreme Court articulated a test to guide courts in drawing that line, a test that, while criticized over the years, remains binding precedent. *See Ehlers-Renzi*, 224 F.3d at 288. Under *Lemon*, to withstand an Establishment Clause challenge, (1) a statute must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster an excessive governmental entanglement with religion. *See* 403 U.S. at 612-13.

## III

Because this appeal comes to us in the posture of a facial, pre-application challenge, our inquiry is limited by the absence of a factual record relating to how the statute is applied. Nevertheless, on a facial challenge, we may still scrutinize a statute, based on its text, context, and legislative history, to determine whether under *Lemon* it has an unconstitutional purpose. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 312-17. And even though we must not speculate about a statute's application in considering the second and third prongs of the *Lemon* test, we can examine the available data to determine the statute's "inevitable" effects. *Id.* at 316. It is under this analytical structure, therefore, that we now turn to consider the plaintiffs' facial challenge to Va. Code Ann. § 22.1-203.

## IV

In applying the first prong of the *Lemon* test — whether § 22.1-203 has a secular legislative purpose — we need not find that the purpose be "exclusively secular." *Lynch*, 465 U.S. at 681 n.6; *see also Wallace*, 472 U.S. at 56. In *Wallace*, the court noted that even though a statute may have a religious purpose, it may still satisfy the *Lemon* test if it also has a "clearly secular purpose." *Id.* Moreover, we have observed that this first prong of *Lemon* is "a fairly low hurdle," *Koenick v. Felton*, 190 F.3d 259, 266 (4th Cir. 1999) (quoting *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir.

1995) (Luttig, J., concurring in the judgment) (internal quotation marks omitted)), so that a statute fails on this account when "there is *no* evidence of a legitimate, secular purpose," *id.* at 265 (emphasis added). Finally, in assessing a statute's purpose we act with appropriate deference to the legislature. *See Wallace*, 472 U.S. at 74 (O'Connor, J., concurring in the judgment) ("[I]nquiry into the purpose of the legislature in enacting a moment of silence law should be deferential and limited").

The minute of silence statute in this case recites that in recognition of the right of pupils to the free exercise of religion and the right of pupils to be free from "pressure from the Commonwealth" to engage or not engage in any religious observation, the Commonwealth was establishing a minute of silence in each classroom. Va. Code Ann. § 22.1-203. The statute states that the minute of silence is explicitly offered to the students for any non-distracting purpose — religious or nonreligious — including prayer or meditation. *See id.* It provides specifically, "each pupil may, in the exercise of his or her individual choice, meditate, pray, or engage in any other silent activity which does not interfere with, distract, or impede other pupils in the like exercise of individual choice." *Id.* On its face, therefore, the statute provides a neutral medium — silence — during which the student may, without the knowledge of other students, engage in religious or nonreligious activity. And its stated purposes include the allowance of both religious and nonreligious activity with the only limitation that it be conducted in a manner that preserves the silence and does not interfere with other students' silent activity. Thus, as written in the statute, the silence is designed to be undirected and unthreatening; it is designed to compromise no student's belief or nonbelief; and it is designed to exert no coercion except that of maintaining silence.

Based on this textual analysis, we conclude that the statute has at least two purposes, one of which is clearly secular and one of which may be secular even though it addresses religion. To the extent that the minute of silence is designed to permit nonreligious meditation, it clearly has a nonreligious purpose. And to the extent it is designed to permit students to pray, it accommodates religion. Even though religion is thus the object of one of the statute's purposes, the *accommodation* of religion is itself a secular purpose in that it fosters the liberties secured by the Constitution. *See Texas Monthly, Inc. v. Bul-*

*lock*, 489 U.S. 1, 12 n.2 (plurality opinion) (Brennan, J.) (noting that a state may reasonably conclude "that religious groups generally contribute to the cultural and moral improvement of the community . . . and enhance a desirable pluralism of viewpoint and enterprise"); *id.* at 38 (Scalia, J., dissenting); *Wallace*, 472 U.S. at 83 (O'Connor, J., concurring) (stating the view that the Court ought to acknowledge openly that the religious purpose in an accommodation statute "is legitimated by the Free Exercise Clause," and that such statutes do not, solely for that reason, amount to unconstitutional "endorsements" of religion because they are consistent with the values of the Constitution).

Taking our analysis beyond the text of § 22.1-203 to the context of its enactment and its legislative history, the evidence does not alter the conclusion that is suggested by the plain meaning of the statute. The superintendent of Virginia's schools noted that in her experience, a moment of silence has proved to be "a good classroom management tool" because it "works as a good transition, enabling students to pause, settle down, compose themselves and focus on the day ahead" making for "a better school day." This is consistent with statements made by Senator Barry and Senator Newman. Senator Barry explained that the statute was enacted to provide an opportunity during which "kids in school would reflect if more than anything else." He indicated that he included prayer in the list of activities permitted during the minute so that prayer would not be excluded or discriminated against. Even Senator Houck, who wanted the word "pray" to be deleted from the statute, acknowledged the statute's secular intent. Indeed, the Department of Education's Guidelines, which were in effect for many years before the 2000 amendments, focused most on the beneficial nonreligious purposes provided by a quiet time.[5] While there can be no doubt from the legislative history that the moment of silence was intended also to accommodate those children who wished to pray silently each day in school, that was but one of the intended purposes.

---

[5]In their argument before the district court, the plaintiffs themselves acknowledged, "[I]t's a good thing for children to start the day with some reflection. It is probably a very good thing. . . . [I]t would help . . . every . . . child to do that."

A statute having dual legitimate purposes — one clearly secular and one the accommodation of religion — cannot run afoul of the first *Lemon* prong, which requires only that there be a secular purpose. Indeed, the *Wallace* Court noted that even though a statute is "motivated in part by a religious purpose" it may still satisfy the *Lemon* test. 472 U.S. at 56 (citing *Abingdon Sch. Dist. v. Schempp*, 374 U.S. 203, 296-303 (1963) (Brennan, J., concurring).

Consideration of the final two prongs of the *Lemon* test need not detain us long because the facial challenge is mounted without evidence of the statute's application in fact. The second prong — that the statute's effect neither advance nor hinder religion — is clearly satisfied in this case given the statute's facial neutrality between religious and nonreligious modes of introspection and other silent activity. *See Widmar v. Vincent*, 454 U.S. 263, 273 (1981) (noting that even foreseeable benefits that religion receives from enactment of broad legislation are only "'incidental'" and "do[ ] not violate the prohibition against the 'primary advancement' of religion") (quoting *Committee for Pub. Educ. v. Nyquist*, 413 U.S. 756, 771 (1973)). Plaintiffs argue, however, that despite the statute's facial neutrality between silent religious expression and silent nonreligious expression, the statute's inevitable effect — given its broad application to children, beginning in kindergarten and continuing through the twelfth grade — will be to promote prayer by creating the perception, especially from the viewpoint of young, impressionable school children, that the Commonwealth endorses prayer. In the context of a facial challenge, however, this fear is speculative at best. Despite language in Supreme Court precedent recognizing the impressionability of elementary school children and the greater threat of religious coercion attendant to religious displays in elementary schools, *see, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592-93 (1992); *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985), nothing the Court has said "suggest[s] that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue," *Good News Club v. Milford Cent. Sch.*, No. 99-2036, slip op. at 16 (U.S. June 11, 2001). To hold otherwise, especially in the context of a facial challenge, would result in the introduction of "a modified heckler's veto, in which . . . religious activity can be proscribed on the basis" of sincere, but utterly mistaken perceptions of state endorsement of religion. *Id.* at 18-19. Therefore, speculative fears as

to the potential effects of this statute cannot be used to strike down a statute that on its face is neutral between religious and nonreligious activity.

And the third prong — that the State not become excessively entangled with religion — is undoubtedly satisfied. If we assume that the statute will be enforced as written and that the teachers will apply it as directed by the superintendent, the teacher will simply inform the students of their statutory options during an enforced minute of silence. Its involvement in religion is negligible, left only to informing students that one of the permissible options during the moment of silence is prayer. If the students were kept uninformed of that right, they might find it necessary to ask teachers whether the allotted time might be used for prayer, increasing the potential for interactions between teachers and religiously motivated students. *See Wallace*, 472 U.S. at 91 (White, J., dissenting).

In sum, in establishing a minute of silence, during which students may choose to pray or to meditate in a silent and nonthreatening manner, Virginia has introduced at most a minor and nonintrusive accommodation of religion that does not establish religion. By providing this moment of silence, the State makes no endorsement of religion. Indeed, when instructing Virginia teachers on the implementation of the statute, State officials warned that teachers are not to permit or tolerate "any coercion or overbearing by some students to force others to engage in or refrain from prayer or any other permitted activity." There is simply no evidence to indicate that Virginia has promoted any religion or promoted religion over nonreligion. Recognizing that the Religion Clauses of the Constitution are intended to protect religious liberty, Virginia's minute of silence is no more than a modest step in that direction by providing a non-intrusive and constitutionally legitimate accommodation.

V

While our independent analysis of the Virginia statute under *Lemon* leads to the conclusion that it is a "permissible accommodation" of religion, the plaintiffs argue that this conclusion is foreclosed by the specific holding of *Wallace*, in which an Alabama moment-of-silence statute was held unconstitutional. More particularly, they

maintain that because the Alabama statute struck down in *Wallace* is indistinguishable from the Virginia statute under consideration here, *Wallace* is "dispositive." For the reasons that follow, we disagree.

A fair reading of *Wallace* compels the conclusion that its holding was based on the unique facts presented in that litigation and that its decision did not categorically prohibit moment-of-silence statutes. The Supreme Court in *Wallace* distinguished its case as "quite different from merely protecting every student's right to engage in voluntary prayer during an appropriate moment of silence during the schoolday," 472 U.S. at 59, a passage that was cited with approval in the Court's decision in *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 313. The outcome in *Wallace* was the culmination of Alabama's attempt to overturn *Everson v. Board of Educ.*, 330 U.S. 1, 14-16 (1947), which rendered the Establishment Clause applicable to the States through the Fourteenth Amendment. As part of its campaign of defiance, Alabama enacted three statutes: Section 1601-20, enacted in 1978, which authorized a one-minute period of silence in all public schools "for meditation"; Section 16-1-20.1, enacted in 1981, which authorized a period of silence "for meditation or voluntary prayer"; and Section 16-1-20.2, enacted in 1982, which authorized "willing students" to be lead by authorized teachers in a prescribed prayer to "Almighty God . . . the Creator and Supreme Judge of the world."

At the preliminary-injunction stage, the district court concluded that the meditation statute, the 1978 enactment, was not objectionable but that the other two statutes were invalid because, as a factual matter, "the sole purpose of both was 'an effort on the part of the State of Alabama to encourage religious activity.'" *Wallace*, 472 U.S. at 41 (quoting *Jaffree v. James*, 544 F. Supp. 727, 732 (S.D. Ala. 1982). With respect to the 1981 enactment, which authorized meditation or prayer, the district court found that the statute failed *Lemon*'s first prong because the prime sponsor of the legislation testified under oath that the legislation was promoted and passed only in an "effort to return voluntary prayer to our public schools." *Id.* at 43. The court also found that Alabama teachers had already begun leading their students in collective prayers, over communicated objections of the plaintiff children. *See Jaffree v. Bd. of Sch. Comm's of Mobile County*, 554 F. Supp. 1104, 1107-08 (S.D. Ala. 1983).

Reviewing this record, the Supreme Court observed that it "reveals that the enactment of § 16-1-20.1 [the 1981 enactment that provided for meditation or prayer] was not motivated by any clearly secular purpose — indeed, the statute had *no* secular purpose." *Wallace*, 472 U.S. at 56 (emphasis in original). The lack of secular purpose for the challenged legislation was shown by the uncontroverted legislative history of the statute as well as live testimony before the trial court. Not only did the Governor of Alabama testify that the State's intent was to have prayer as part of daily classroom activity, but the State also made no claim that the statute was enacted to accommodate the free exercise of religion until late in the litigation. The Supreme Court reached the conclusion that the 1981 enactment had an unlawful purpose also because of the language of the two other statutory provisions involved in the litigation, the 1978 enactment (providing for meditation) and the 1982 enactment (providing for prayer to Almighty God). While the 1982 enactment had a "wholly religious character" that was "plainly evident from its text," *id*. at 58, the "wholly religious character" of the 1981 enactment was more subtle but no less certain when its language was compared to that of the 1978 predecessor (providing only for meditation). Thus, the Supreme Court noted that "while the [legislative intent] merely [to] protect every student's right to engage in voluntary prayer during an appropriate moment of silence during the school day" was constitutionally unobjectionable, the 1978 statute, providing for meditation, had already protected that right, and thus, the enactment of the 1981 statute, providing for meditation and prayer, did not, and could not, as a logical matter, further "any secular purpose that was not fully served by [the 1978 enactment]." *Id*. at 59. Accordingly, only two conclusions were consistent with the passage of the 1981 enactment: Alabama enacted the statute either "(1) . . . to convey a message of state endorsement and promotion of prayer; or (2) . . . for no purpose." *Id*. at 59. Refusing to attribute irrationality to the Alabama legislature, the Supreme Court concluded that the statute was enacted for a rational, but plainly unlawful purpose.

In short, the Supreme Court observed that "the State did not present evidence of *any* secular purpose," *id*. at 57, and the purpose as singularly religious was confirmed from "consideration of the relationship between the statute at issue and the two other measures that were considered in the case," *id*. at 58. The Court made clear, however, that

enacting a statute solely for a religious purpose is "*quite different from merely protecting every student's right to engage in voluntary prayer during an appropriate moment of silence during the school day.*" *Id.* at 59 (emphasis added).

This admonition by the *Wallace* Court that its holding did not reach to moment of silence statutes that had both secular and religious purposes was confirmed in the separate concurring opinions of Justices Powell and O'Connor. Justice Powell agreed that the evidence in the record indicated that the Alabama moment of silence statute was enacted solely for a religious purpose, rendering unnecessary any analysis under the other two prongs of the *Lemon* test. But he added, "Although we do not reach the other two prongs of the *Lemon* test, I note that the effect of a straightforward moment-of-silence statute is unlikely to advance or inhibit religion . . . nor would such a statute foster an excessive government entanglement with religion." *Id.* at 66 (Powell, J., concurring) (internal quotation marks and citations omitted). Similarly, Justice O'Connor noted that a moment of silence statute is not inherently religious and that during the moment of silence a student who objects to prayer is left to his or her own thoughts and not compelled to listen to the prayers or thoughts of others. She concluded, "It is difficult to discern a serious threat to religious liberty from a room of silent, thoughtful schoolchildren." *Id.* at 73 (O'Connor, J., concurring in the judgment). Justice O'Connor's concurrence in *Wallace* also rejects one of the arguments advanced by plaintiffs in this litigation, namely, that Virginia's use of the word "pray" is dispositive of an intent to endorse prayer. *Wallace*, 472 U.S. at 73 ("Even if a statute specifies that a student may choose to pray silently during a quiet moment, the State has not thereby encouraged prayer over other specified alternatives.").

The factual record of the case before us stands in stark contrast to the one presented to the Supreme Court in *Wallace*. First, there is no evidence that the Commonwealth of Virginia acted in open defiance of federal constitutional law. To the contrary, its debates reflected serious consideration of relevant Supreme Court precedents and concern that it act constitutionally in enacting its proposed statute. Indeed, rather than defy the Supreme Court by seeking to conduct an end run around its precedents, the Virginia House of Delegates passed

a resolution requesting that Congress initiate a constitutional amendment.

In addition, the legislators clearly debated and acknowledged both religious and secular purposes for the proposed statute, describing the benefits of a minute of silence even for students who would not use the allotted time to pray.

Finally, unlike the Alabama teachers who admitted to leading their students in religious chants and prayers without even waiting for the passage of a State law authorizing such conduct, the Virginia teachers were operating under cautious guidelines circulated five years earlier. Moreover, after passage of the 2000 amendment, the superintendent of schools in Virginia directed a memorandum to all teachers, admonishing them not to permit the minute of silence to become a religious observance. There is no evidence in this record that Virginia teachers have used the minute of silence, or any other occasion, to lead their students in collective prayer, as was the case in *Wallace*.

The plaintiffs point to the fact that the 2000 amendments to Virginia's statute made the minute of silence mandatory throughout the State, therefore rendering it coercive. But we can find no material distinction between the 1976 version of § 22.1-203, in which a political subdivision was *authorized to impose* a minute of silence and the current statute where the State itself imposed the minute of silence. Both are mandatory minutes of silence for the students implicated, but neither is coercive in that the affected students are left to choose how they will use the minute of silence.

In short, the holding in *Wallace* is clearly distinguishable. Indeed, the Supreme Court went out of its way to distinguish that case from the one now before us.

## VI

The Supreme Court has ruled clearly that state-sponsored prayer conducted in public schools violates the Establishment Clause of the First Amendment and that student-sponsored prayer in public schools *may* violate it because, in the coercive context of the classroom, a

vocal prayer infringes the religious liberty of students who would choose not to participate. A moment of silence, however, lacks this dispositive element of coercion. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 313; *Wallace*, 472 U.S. at 72 (O'Connor, J., concurring in the judgment). Establishing a short period of mandatory silence does not *ipso facto* amount to the establishment of anything but silence.

The minute of silence established in Virginia by § 22.1-203 for each public school classroom is designed to provide each student at the beginning of each day an opportunity to think, to meditate, to quiet emotions, to clear the mind, to focus on the day, to relax, to doze, or to pray — in short, to provide the student with a minute of silence to do with what the student chooses. And just as this short period of quiet serves the religious interests of those students who wish to pray silently, it serves the secular interests of those who do not wish to do so. Because the state imposes no substantive requirement during the silence, it is not religiously coercive. Neither the teacher nor any student will know how any other student uses the time because it is, fortunately, inherent in the human constitution that what transpires in the mind cannot be known by others.

The statute's use of the word "pray," in listing an unlimited range of mental activities that are authorized during the minute of silence, cannot by itself be a ground for finding the statute unconstitutional. Indeed, to require a ban on the use of religiously related terms would manifest a hostility to religion that is plainly inconsistent with the religious liberties secured by the Constitution.

Accordingly, after considering the text of the statute, its legislative history, and the facts surrounding its enactment, we hold that Virginia Code Annotated § 22.1-203 (Michie 2000) does not violate the Establishment Clause of the First Amendment. The judgment of the district court is therefore

*AFFIRMED*.

KING, Circuit Judge, dissenting:

Today the majority spurns controlling precedent in upholding the constitutionality of a Virginia statute that establishes religion in the

public schools of the Commonwealth. By mandating a "minute of silence" at the start of each schoolday, the Commonwealth has engaged in a thinly veiled attempt to reintroduce state-sanctioned prayer into its schools. *See* Va. Code Ann. § 22.1-203 (Michie 2000) (the "Virginia statute"). Because the Virginia statute is repugnant to the Constitution's Establishment Clause and erodes the separation between church and state, I must dissent.

The First Amendment, applicable to the states through the Fourteenth, explicitly declares that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). By making the Establishment Clause part of the supreme law of the land, the Framers sought to protect our citizenry from the coercive power of majoritarian government by denying it the authority to legislate in the furtherance of any religion. Through the ages, the Supreme Court has recognized the neutral, "hands off" role that government in our country must play regarding the establishment of religion. As Justice Clark eloquently stated years ago,

> The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard.

*Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 226 (1963).

Although the majority characterizes it otherwise, the "minute of silence" mandated by the Virginia statute is, like the Trojan Horse, a hollow guise. But the citizens of Virginia have naught to fear from Greek soldiers. Instead, the Commonwealth bears its "gift" as a means of invading Justice Clark's "inviolable citadel" — the hearts and minds of Virginia schoolchildren — in an effort to once more usher state-sponsored religion into public schools.

I subscribe to religious tolerance and, as a Scottish Presbyterian, I have nothing against prayer — either self-initiated or sponsored by

and carried out by families and religious organizations. It is elementary, moreover, that under our Constitution and the Supreme Court's binding interpretations of it, the meticulous separation of church and state is designed not to protect government from religion, but to protect American citizens and their religious practices from government.

I.

The majority cannot uphold the constitutionality of the Virginia statute without directly contravening controlling Supreme Court precedent, most notably *Wallace v. Jaffree*, 472 U.S. 38 (1985), and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000).[1] These decisions require us to conclude that the Virginia statute fails to pass constitutional muster under the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (holding that, to comport with the Establishment Clause, "[f]irst, the statute must have a secular legislative purpose").

Under the *Lemon* test's first prong, "it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion.'" *Wallace*, 472 U.S. at 56 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). In making this determination, we may inquire "'whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer in public schools.'" *Santa Fe*, 530 U.S. at 308 (quoting *Wallace*, 472 U.S.

---

[1]In emphasizing the importance of precedent, the Court has forcefully stated that "unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam). As Chief Justice Rehnquist observed in *Dickerson v. United States*, "While *stare decisis* is not an inexorable command, . . . the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some 'special justification.'" 530 U.S. 428, 443 (2000) (internal citations and quotation marks omitted). There is, in this case, no special justification to depart from precedent. And even if there were, only the Supreme Court has the power to overrule one of its precedents. *See Wallace*, 472 U.S. at 47 n.26 (citation omitted).

at 76 (O'Connor, J., concurring in judgment)). Given the circumstances surrounding enactment of the Virginia statute, we are compelled to answer these questions with a resounding "Yes!".[2]

### A.

The historical facts surrounding passage of the Virginia statute are undisputed; it is the interpretation of these facts that lies at the core of this controversy. Thus, we must bear in mind that our inquiry is "'in large part a legal question to be answered on the basis of judicial interpretation of social facts[,]'" and that "[e]very government practice must be judged in its unique circumstances[.]" *Santa Fe*, 530 U.S. at 315 (quoting *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring)). In this inquiry, the following points are salient:

- The Virginia statute's preamble fails to provide any purpose unrelated to religion, but rather speaks only of accommodating religious observances on school property;

- The legislature defeated a proposed amendment that would have deleted "pray" as one of just two specific activities identified by the statute as acceptable uses of the minute of silence;

- In amending an antecedent, permissive statute, the legislature imposed a mandatory observance, affecting some one million Virginia schoolchildren;

- The Virginia statute provides for the Commonwealth's

---

[2]Because I conclude that the Virginia statute violates the *Lemon* test's first prong, it is unnecessary to address the test's second and third prongs, i.e., that the statute's "principal or primary effect must be one that neither advances nor inhibits religion," and that it "must not foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13 (internal citations and quotation marks omitted). As Justice Stevens observed in his opinion for the Court in *Wallace*, "[N]o consideration of the second or third [*Lemon*] criteria is necessary if a statute does not have a clearly secular purpose." 472 U.S. at 56.

defense of individual school systems from the inevitable lawsuits challenging the statute's constitutionality;

- The legislature contemporaneously passed a joint resolution denouncing the Supreme Court's landmark decision in *Engel v. Vitale*, 370 U.S. 421 (1962) (declaring that state-sponsored prayer in public schools contravenes the Establishment Clause), and requesting Congress to pass a constitutional amendment permitting voluntary prayer in the classroom.

The Commonwealth contends that there are only secular purposes behind the Virginia statute, such as instilling calm in the classroom and accommodating the free exercise of religion. However, the statute's true aim is clear: to encourage students to pray.

I am struck by the pertinent comments of Senator John Edwards of Roanoke during floor debate of the Virginia statute. Senator Edwards remarked: "I went to seminary. I'm a religious person. I also respect the rights of others. . . . When we put in a bill that, in effect, requires a moment of prayer, then we are offending the First Amendment and we're offending those whose beliefs are different than ours." J.A. 180.[3] Just a few months later, in his *Santa Fe* opinion, Justice Stevens emphasized that "nothing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday. But the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer." *Santa Fe*, 530 U.S. at 313.

---

[3]Senator Edwards's remarks are offered not as proof that the Virginia statute violates the Establishment Clause, but rather because he recognized from the entirety of the circumstances — as I do, and as any objective observer should — that the real purpose of the statute is Virginia's endorsement of prayer in the Commonwealth's schools. It is not necessarily helpful to rely on the comments of individual legislators to ascertain the purpose behind the statute, because some insisted that their intent was purely neutral, while others advanced impermissible motives.

B.

To effectively counter the position espoused by my friend Judge Niemeyer, I need not look beyond the pertinent and binding Supreme Court decisions — including *Wallace* and *Santa Fe* — involving transgressions of the Establishment Clause in our public schools. Sixteen years ago in *Wallace*, the Court determined that the Alabama statute at issue (permitting a minute of silence for "meditation or voluntary prayer" at the start of each schoolday) failed the first prong of the *Lemon* test because its object was wholly religious. *See* 472 U.S. at 56. The Court so concluded because, in relevant part, the measure's sponsor inserted into the legislative record a statement that the statute was an "effort to return voluntary prayer" to the public schools. *See id.* at 56-57. Moreover, there was an existing minute of silence statute in Alabama, without the "prayer" option, that already fully served any secular purpose. *See id.* at 59.[4]

The majority seeks to distinguish *Wallace* on the ground that while the Alabama statute had no secular purpose, the Virginia statute has at least two neutral goals: accommodating the free exercise of religion, and improving student focus and discipline. These secular goals, according to the majority, satisfy the *Lemon* test's first prong, because "a statute fails on this account [only] when 'there is *no* evidence of a legitimate, secular purpose[.]'" *Ante*, at 16 (quoting *Koenick v. Felton*, 190 F.3d 259, 265 (4th Cir. 1999)) (emphasis in original). This conclusion derives from Justice Stevens's observation in *Wallace* that "a statute that is motivated in part by a religious purpose *may* satisfy

---

[4]While Justice O'Connor observed, in her concurring opinion in *Wallace*, that an appropriately drawn moment of silence statute could be constitutional, *see* 472 U.S. at 73-74 (O'Connor, J., concurring in the judgment), the Virginia statute is materially indistinguishable from the Alabama statute found invalid in *Wallace*. That is, the Virginia statute is one where "the face of the statute or its legislative history . . . clearly establish[es] that it seeks to encourage or promote voluntary prayer over other alternatives, rather than merely provide a quiet moment that may be dedicated to prayer by those so inclined." *Id.* at 73. Indeed, Justice Stevens also recognized that "[t]he legislative intent to return prayer to the public schools is, of course, quite different from merely protecting every student's right to engage in voluntary prayer during an appropriate moment of silence during the schoolday." *Wallace*, 472 U.S. at 59.

the first [*Lemon*] criterion." 472 U.S. at 56 (emphasis added). Of course, this ambiguous comment also bolsters the converse argument that a statute is not necessarily saved from invalidation under the Establishment Clause merely because it serves some secular purpose. *Compare Lynch*, 465 U.S. at 680 (Burger, C.J.) (recounting that "[t]he Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations"), *with id.* at 690-91 (O'Connor, J., concurring) (maintaining that the *Lemon* test's first prong "is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes").

Although I harbor serious doubts concerning the soundness of the majority's viewpoint, I find it unnecessary to engage in this debate, because it is manifest that a purported secular purpose cannot possibly satisfy the *Lemon* test's first prong if that purpose is patently insincere. *See Santa Fe*, 530 U.S. at 308 (recognizing that, while "some deference" is owed to a legislature's professed secular purpose for an arguably religious policy, "it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one'") (quoting *Wallace*, 472 U.S. at 75 (O'Connor, J., concurring in judgment)) (alteration in original); *see also Stone v. Graham*, 449 U.S. 39, 41 (1980) (invalidating a Kentucky statute requiring the posting of the Ten Commandments in public school classrooms, despite purported secular educational purposes, because "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature . . . and no legislative recitation of a supposed secular purpose can blind us to that fact"); *Schempp*, 374 U.S. at 224 (rejecting assertion that daily readings from the King James version of the Bible served secular educational purpose, because "[s]urely the place of the Bible as an instrument of religion cannot be gainsaid, and the State's recognition of the pervading religious character of the ceremony is evident from" policies allowing use of an alternative version of the Bible or opting out of the exercise). We are bound by duty to look below the surface; otherwise, a statute could run afoul of the Establishment Clause only in a *Wallace*-type situation where legislators are blatantly motivated by impermissible religious considerations. The mandate of the Establishment Clause cannot be so easily and disingenuously evaded.

Indeed, in its recent decision in *Santa Fe*, the Supreme Court had no trouble discrediting the school district's asserted purposes for its longstanding policy sanctioning student-led prayer prior to high school football games. The district advanced several secular justifications for this pre-game "invocation," including fostering free expression, solemnizing the sporting event, promoting good sportsmanship and student safety, and establishing an appropriate environment for competition. *See Santa Fe*, 530 U.S. at 309. But the Court concluded, inter alia, that the district's approval of just one specific kind of message, the "invocation" (a term that connotes a religion-infused address), was not necessary to further these asserted purposes. *See id.* at 306-07, 309. Moreover, the Court reasoned that "the fact that only one student is permitted to give a content-limited message suggests that this policy does little to 'foste[r] free expression.'" *Id.* at 309 (alteration in original). The Court's detailed examination of the policy's text in light of the school district's history of sanctioning pre-game prayers led to the inevitable conclusion that this policy could not satisfy the *Lemon* test's first prong. Writing for the Court, Justice Stevens explained:

> The District . . . asks us to pretend that we do not recognize what every Santa Fe High School student understands clearly — that this policy is about prayer. The District further asks us to accept what is obviously untrue: that these messages are necessary to "solemnize" a football game and that this single-student, year-long position is essential to the protection of student speech. We refuse to turn a blind eye to the context in which this policy arose, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer.

*Id.* at 315. Justice Stevens did not permit the First Amendment to be skirted with a nod and a wink, and neither would I.

### C.

In urging us to uphold the constitutionality of the Virginia statute, the Commonwealth asks us to accept three asserted secular purposes: (1) "implementing constitutional guarantees of religious liberty within the public schools"; (2) "maintaining good order and discipline,

affording an opportunity for introspection, and improving student focus on the educational activities of the day"; and (3) "extending the benefits of a minute of silence to public schools statewide and providing local school divisions with a defense in any lawsuit against the Act." Appellees' Br., at 40. I examine each of these purported justifications in turn.

1.

First, the Commonwealth defends its explicit references to religion and prayer in the Virginia statute as means to accommodate the free exercise of religion. The Commonwealth points to the statute's preamble, which provides:

> In order that the right of every pupil to the free exercise of religion be guaranteed within the schools and that the freedom of each individual pupil be subject to the least possible pressure from the Commonwealth either to engage in, or to refrain from, religious observation on school grounds, the school board of each school division shall establish the daily observance of one minute of silence in each classroom of the division.

Va. Code Ann. § 22.1-203. This preamble, however, is a contradiction in terms. That is, if the Commonwealth of Virginia were truly concerned about subjecting students to undue pressure to engage in or refrain from religious observances during the schoolday, why would it impose a minute of silence in such a manner that students must contemplate daily whether to pray or not? And, if the Old Dominion genuinely wishes to protect the rights of "every pupil" to the free exercise of religion, why would the statute only accommodate those students whose belief systems embrace engaging in prayer while sitting and while remaining silent?

Just as the single-student, content-limited invocation in *Santa Fe* did little to further the asserted goal of fostering free expression, the Virginia statute is exceedingly limited in its ability to facilitate the free exercise of religion. This statute seeks to accommodate only those public school students who engage in religious observances while silent, seated, and still — that is, primarily those who engage

in the accepted and traditional Protestant practices. In so doing, it runs afoul of and treads upon the traditional prayer practices of, for example, Catholic, Muslim, and Jewish children.[5] In these circumstances, the religious practices of such children deserve — and, under the Constitution, they are entitled to — protection from the actions of their government.

Moreover, contrary to the Commonwealth's assertions, the Virginia statute is entirely unnecessary to protect the free exercise of religion in public schools. Indeed, the Supreme Court rejected a similar free exercise argument in support of the statute in *Wallace*. *See* 472 U.S. at 57-58 n.45. There, the Court dismissed Governor George C. Wallace's contention that the Alabama minute of silence measure was "best understood as a permissible accommodation of religion[.]" *Id.* (citation omitted). The Court concluded that this assertion was based on the unsupported "theory that the free exercise of religion of some of the State's citizens was burdened before the statute was enacted." *Id.* That is, Alabama already permitted a minute of silence during which students could choose to silently pray; therefore, the State did not need to enact a statute specifying prayer as a favored option in order to accommodate the free exercise of religion. *See id.*; *cf. Edwards v. Aguillard*, 482 U.S. 578, 587 (1987) (discrediting the contention that a Louisiana statute requiring schools to teach creationism with evolution advanced academic freedom, because the statute did not confer "teachers a flexibility that they did not already possess[,]"

---

[5]For instance, in her affidavit, twelfth-grader Vanessa Brown of Fairfax, a Catholic, states, "I cannot practice my religion in its customs (i.e., standing, kneeling, genuflecting) without violating the law." J.A. 199. When praying, Brown either stands or kneels, concluding her prayers "by making the sign of the cross." *Id.* at 198. Similarly, third-grader Amy Cohen of McLean, a child of the Jewish faith, notes that she often prays through song. *See id.* at 203. Jordan Kupersmith, an eleventh-grader from Potomac Falls, also expresses his concerns regarding the minute of silence, reasoning that "[n]ot all religions can pray silently while being seated. Some must stand, some must kneel on a prayer rug." *Id.* at 248. A common thread linking these students with other plaintiffs who submitted affidavits is a concern over being ridiculed for not bowing their heads in silent prayer and for asserting opposition to the mandate of the Virginia statute.

as "no law prohibited Louisiana public school teachers from teaching any scientific theory").

In this instance, rather than adding a reference to "prayer" to its minute of silence statute, the Virginia legislature refused to remove it. According to the Commonwealth, an explicit reference was necessary "to guarantee religious liberty and prevent discrimination against prayer." Appellees' Br., at 44. This contention, however, like the free exercise defense asserted by Governor Wallace, is premised on the theory that the right to engage in silent prayer would somehow be burdened without inclusion of the word "pray" in the Virginia statute. In support of this theory, the Commonwealth advances a list of recent incidents in Virginia showing "a tendency toward discrimination against religious expression in the public schools," including prohibitions on Bible club meetings and distribution of religious materials on school property. *See id.* at 10-11. However, not one of these episodes involved interference with silent prayer and, thus, these incidents fail to support the Commonwealth's theory of inevitable discrimination.

The Commonwealth's position is supported only by mere speculation that, without express reference to prayer in the Virginia statute, students would not be advised that prayer is an allowable activity during the minute of silence, or they would be admonished that prayer is an impermissible activity during this time. Such conjecture is entirely insufficient to justify the Commonwealth's purported accommodation of religious freedom; in turn, it cannot establish a sincere secular purpose for the inclusion of "pray" in the Virginia statute.[6] Because the statute is unnecessary to protect the free exercise of religion, and because it accommodates only select religious observances, it simply cannot be justified as a means to ensure the constitutional rights of Virginia schoolchildren. *Cf. Walter v. West Virginia Bd. of Educ.*, 610 F. Supp. 1169, 1176 (S.D. W. Va. 1985) (Hallanan, J.) (rejecting a "free exercise" justification for a West Virginia measure

[6]Indeed, the majority rejects as "speculative fear" the plaintiff's assertion that impressionable schoolchildren will perceive the Virginia statute as an endorsement of prayer. *See ante*, at 18. According to Judge Niemeyer, "In the context of a facial challenge, this fear is speculative at best." *Ante*, at 18. The plaintiff's contention regarding the impressionability of children is further discussed at Part II, *infra*.

of the same ilk, because this rationale was unprecedented and "inherently contradictory"). Those rights are best protected by the First Amendment itself, as promulgated and ratified over two hundred years ago.

2.

The Commonwealth asserts that the Virginia statute also serves the purpose of providing a quiet moment each morning that will allow students to engage in introspection and to focus on the day ahead, thereby fostering discipline and order in the classroom. Strikingly, no such purpose is mentioned in the statute's preamble (which speaks only of guaranteeing "the right of every pupil to the free exercise of religion") or elsewhere in the statute's text. *See* Va. Code Ann. § 22.1-203. Indeed, the preamble to the Virginia statute stands in stark contrast to the uncodified preamble to a moment of silence measure in Georgia, which was upheld by the Eleventh Circuit. *See Bown v. Gwinnett County Sch. Dist.*, 112 F.3d 1464 (11th Cir. 1997). The preamble to the Georgia statute explains that it was intended to provide students "a moment of quiet reflection before plunging headlong into the day's activities[,]" as a benefit to students and society. *Id.* at 1466 (quoting Moment of Quiet Reflection in Schools Act, Act No. 770, § 1, 1994 Ga. Laws 256, 256). Moreover, unlike the text of the Virginia statute, the text of the Georgia statute makes clear that the "moment of quiet reflection . . . is not intended to be and shall not be conducted as a religious service or exercise but shall be considered as an opportunity for a moment of silent reflection on the anticipated activities of the day." *Id.* (quoting Ga. Code Ann. § 20-2-1050(b) (Michie 1996)).[7]

---

[7]The Georgia statute is of particular interest because, according to the Commonwealth, "[t]he court-approved guidelines for implementing the Georgia statute are the model for the guidelines issued in Virginia." Appellees' Br., at 33. Indeed, a June 13, 2000 memorandum to school officials from Virginia's Superintendent of Public Instruction adopts the Georgia statute's preamble, practically verbatim, as a statement of the General Assembly of Virginia's intent in passing its statute (though this is not the statement of purpose adopted by the Virginia legislature in the actual text of the statute). The memorandum provides:

In concluding that the Georgia statute furthered a sincere secular purpose, the Eleventh Circuit determined that: the statute's "preamble sets forth a clearly secular purpose"; that purpose "is repeated expressly in the language of the statute itself"; "the statute indicates that Georgia is not advocating the moment of quiet reflection as a time for religious activity"; and the legislative history of the statute, "although somewhat conflicting, is not inconsistent with the express statutory language articulating a clear secular purpose and disclaiming a religious purpose." *Bown*, 112 F.3d at 1469-71. By contrast, there is absolutely no mention of the Virginia legislature's second purported secular purpose — e.g., providing students a minute of valuable introspection and instilling calm in the classroom — in its

---

The General Assembly recognized that, in today's hectic society, all too few of our citizens are able to experience a moment of quiet reflection before plunging headlong into the day's activities, and that our young citizens are particularly affected. This legislation reflects the view that our young, and society as a whole, would be well served if students were afforded a moment of quiet reflection at the beginning of each day. Accordingly, the new statute states the following:

> In order that the right of every pupil to the free exercise of religion be guaranteed within the schools . . . .

J.A. 251 (quoting Va. Code Ann. § 22.1-203). The memorandum also counsels that a copy of the Virginia statute should be sent home with students at the beginning of each school year, and it admonishes, like the policy in *Bown*, that teachers and administrators should be cautioned "not to suggest or imply that students should or should not use that time for prayer." *Id.* at 252. After newspapers reported that the memorandum instructed school officials that they should avoid advising students that prayer was a permissible activity, Virginia's Attorney General issued a statement clarifying that students and parents were to be informed in writing at the beginning of each school year of the right to pray, and that, "[i]f school officials believe other steps are needed to convey that information[,] . . . nothing in the Superintendent's memorandum prevents that from being done." *Id.* at 254. According to the Attorney General's statement, "It is essential that students be fully advised that they have the fundamental right to use the minute of silence for prayer if they so choose." *Id.*

statute. But there are, of course, plenty of references to prayer and religion.

Moreover, on the one hand, the Eleventh Circuit was persuaded of the Georgia statute's constitutionality because it removed an express reference to "prayer" from its predecessor statute. *See id.* at 1469 n.3 ("The deletion of the words 'prayer or meditation' and the substitution of the words 'period of quiet reflection' provides some support for the idea that the Act's purpose is secular and is not to establish a moment of prayer."). On the other hand, the Virginia legislature refused to remove the word "pray" from its statute. Indeed, that unwillingness to delete "pray" from the Virginia statute demonstrates why it is less like the Georgia statute upheld in *Bown* by the Eleventh Circuit, and more like the Alabama statute invalidated in *Wallace* by the Supreme Court. In *Wallace*, the Court determined that the addition of "or voluntary prayer" to the existing statute providing solely for a period of "meditation" indicated "that the State intended to characterize prayer as a favored practice." 472 U.S. at 60. The Court concluded that "[s]uch an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Id.* Here, too, it is inescapable that the Virginia legislature intended to endorse prayer as a favored practice, in violation of the Establishment Clause.[8]

Though the majority concludes that the Virginia statute "is designed to provide each student at the beginning of each day an opportunity to think, to meditate, to quiet emotions, to clear the mind, to focus on the day, to relax, to doze, or to pray[,]" *ante*, at 24, only two of these activities — meditating and praying — are expressly endorsed by the Commonwealth. Moreover, while the majority is satisfied that, "[b]ecause the state imposes no substantive requirement

---

[8]This impermissible religious purpose is evident throughout the Virginia statute's text and legislative history, not just from an isolated reference to prayer. Thus, it is irrelevant to our inquiry whether use of the word "pray" in a minute of silence measure constitutes a per se violation of the Establishment Clause. *See ante*, at 24 ("The statute's use of the word 'pray,' in listing an unlimited range of mental activities that are authorized during the minute of silence, cannot by itself be a ground for finding the statute unconstitutional.").

during the silence, [the statute] is not religiously coercive[,]" *id.*, I am not comforted by the Virginia statute's allowance of "choice." Simply because the Commonwealth does not explicitly require its public school students to pray does not mean that they are not being subtly coerced to do so.

3.

Finally, the Commonwealth insists that the third secular purpose of the Virginia statute was to amend an existing measure: first, to impose the mandatory — rather than permissive — observance of a minute of silence in order to "extend[ ] the benefits . . . to public schools statewide"; and, second, to authorize legal representation by the Attorney General in lawsuits challenging the statute. *See* Appellees' Br., at 40. These assertions command little consideration. That is, the compulsory nature of the statute plainly renders it even more offensive than the *Wallace* statute, which at least made the exercise optional. Moreover, the Commonwealth's provision of legal representation for the defense of local schools is a telling acknowledgment that the statute invites a constitutional challenge.

II.

Although I need not address the additional requirements of the *Lemon* test, *see supra* note 2, I am compelled to comment on the position taken by the majority in its discussion regarding the test's second prong. The majority rebuffs the plaintiff's assertion that, no matter whether the Virginia statute's purpose is secular, its "inevitable effect . . . will be to promote prayer by creating the perception, especially from the viewpoint of young, impressionable school children, that the Commonwealth endorses prayer." *Ante*, at 18. In doing so, Judge Niemeyer relies on the Supreme Court's recent decision in *Good News Club v. Milford Central School*, 121 S. Ct. 2093 (2001), for the proposition that the special impressionability of children is irrelevant in this case to determining whether the Virginia statute encroaches on the Establishment Clause. *See ante*, at 18.

I must take issue with Judge Niemeyer's characterization of the decision in *Good News Club*. Therein, the Court concluded that a school's refusal to permit after-hours meetings on its property by a

Christian children's club violated the club's free speech rights, and that this infringement was unnecessary under the Establishment Clause. In so holding, Justice Thomas pointed out that the impressionability of students would not necessarily be relevant to the Establishment Clause calculus where "the school was not actually advancing religion[.]" *Id.* In seeking to justify its position, the majority seizes upon this language. *See ante*, at 18 ("Despite language in Supreme Court precedent recognizing the impressionability of elementary school children and the greater threat of religious coercion attendant to religious displays in elementary schools, nothing the Court has said 'suggest[s] that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue.'") (internal citations omitted). The majority's analysis begs the question because it assumes, incorrectly, that the Virginia statute does not "advance religion."[9]

   Contrary to the majority, I find ample support in the Supreme Court's decisions for the conclusion that Virginia's one million schoolchildren, some as young as kindergartners, are especially deserving of protection from the Commonwealth's unconstitutional endorsement of prayer. Indeed, in 1987, Justice Brennan explicitly stated that the Court

---

[9]Moreover, it seems to me that Justice Thomas simply recognized that "whatever significance" the Court has traditionally assigned to the impressionability of younger children in Establishment Clause cases, this factor has never been used to invalidate the type of conduct at issue in *Good News Club* — "*private* religious conduct during nonschool hours [that] merely . . . takes place on school premises where elementary school children may be present." 121 S. Ct. at 2104 (emphasis added). Nonetheless, Justice Thomas proceeded to consider the possible misperceptions of schoolchildren with regard to after-hours religious activities on school grounds. *See id.* at 2106. In the end, he concluded that "these circumstances simply do not support the theory that small children would perceive endorsement here[,]" and that he could not say "the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." *Id.* Because of these particular circumstances, Justice Thomas "decline[d] to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive." *Id.*

has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. Furthermore, the public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools.

*Edwards*, 482 U.S. at 583-84 (internal citations, quotation marks, and alterations omitted).

### III.

In Virginia, impressionable children must now engage in a minute of silence — and are encouraged to silently pray — at the start of every schoolday. This exercise is sponsored by their government and implemented by their teachers. The observance occurs in Virginia public school classrooms each morning, in a place and at a time when the presence of these schoolchildren is required.

Because this trespass on First Amendment rights is one that we should not abide, I respectfully dissent.